## Smull *against* Jones.

Lien creditors, as well as others, may purchase jointly at sheriff's sale, if all be open and fair. A combination of interests for that purpose is not necessarily corrupt. It is the end to be accomplished which makes such a combination lawful or otherwise : if it be to depress the price of the property by artifice, the purchase will be void ; if it be to raise the means of payment by contribution, or to divide the property for the accommodation of the purchasers, it will be valid.

If a purchaser at sheriff's sale participate in a fraudulent contrivance, by which he was enabled to become the purchaser, in an action of ejectment against him for the property purchased, it is not necessary that the plaintiff should offer to refund the amount which was bid at the sheriff's sale and paid for the title.

ERROR to the Common Pleas of *Dauphin* county.

This was an action of ejectment for a house and lot in Harrisburg, by John Smull against Andrew J. Jones, Theophilus Fenn, William E. Camp, and the Harrisburg Savings Institution.

The title to the property in controversy was in John Smull, the plaintiff.

The defendants gave in evidence the record of judgments against John Smull, executions thereupon, and the sale of the property by the sheriff to Andrew J. Jones & Co., and the sheriff's deed,

[Smull v. Jones.]

dated 26th of November 1838, for the consideration of $6680. Also a deed of the 20th of February 1839, by Andrew J. Jones and wife, to Theophilus Fenn, for the one undivided half of the property.

The plaintiff alleged that this sale was fraudulent, and vested no title in the purchaser; and to support this position he gave the following evidence:

John Snevily sworn. The property belonged to John Smull. He owed me a considerable sum of money. I intended to buy the property the first time it was sold, when Mr Burke bought it. I bid on it. I had not money enough to buy it, and stopped bidding. I spoke to Mr Burke about it after the sale. Mr Smull came to me with tears in his eyes. I examined the papers, and found the sale could be set aside. Mr Jones had a claim, and Mr Fenn had a claim; they seemed to say they would give more; they told me they would, and signed a paper to that effect. I employed Mr M'Clure and Mr Ayres (paper shown — this is the paper, 3d of September 1838) to have sale set aside. The sale was set aside. The day of the second sale, in the morning, Mr Martin and I met at Smull's corner; said he wanted to buy the house, but had not the money. Martin and I went to Jones; Mr Martin agreed to take one-fourth of the property, and I was to take one-fourth, Jones one-fourth, and one-fourth Fenn was to take, and I was to take Martin's note for his fourth. Fenn was not present. We agreed that Jones should buy the property in before dinner. I met Fenn; he told me Jones wanted to see me about this property. I asked him what conclusion they had come to about what he would pay for it. He said it would take about $16,000 to pay his (Fenn's) judgment. He said we would not let it go under $16,000. It was supposed it would go up to that. I saw no more of Martin that day. Jones and I went to the sale. I did not bid on it, but noticed the bids to know how it was going up. It was struck off for less than we had agreed to buy it for. It did not cover any more of my judgments than Burke's purchase did. It covered a few thousand dollars. The $16,000 would have covered all my judgments. I went back in the evening, after dark; Fenn was in the store, and Jones gave me the paper, this is it, dated 6th of October 1838. Jones said I had bought some of these judgments for less than their face, and he thought he should have an interest in them. I agreed that he should. It was understood that they should be paid, and Mr Fenn's out of the sale. I told Smull if I got the property I would release the property. My judgments were not paid by the sale; but if the property is worth $16,000, my judgments are paid.

Plaintiff offers to prove by this witness that Jones and Fenn have denied that Snevily had any interest in the property, and on the trial before arbitrators, said he had not given any paper acknowledging the interest of the witness; and have refused to

go into the arrangement and pay Snevily's judgments; this offered in connexion with the paper, dated 6th of October 1838.

The counsel for defendants objected to the evidence. The court sustained the objection, and rejected the evidence all but the paper. Counsel for plaintiff excepted.

### *Copy of paper in evidence above referred to.*

"It is understood that John Snevily is equally connected with me in the purchase of the Smull property.

"A. J. Jones.

"*October* 6, 1838."

A great many were present when Jones and I stood there. Mr Jones said the property would be bid up to $16,000. It was generally understood that we would buy it, because we were all joined in setting the sale aside.

John Stahl sworn. I was the deputy sheriff at the time of this sale. The property was put up to sale, and knocked down to A. J. Jones & Co. The conditions of the sale were drawn out by me and signed by A. J. Jones & Co. "Signed A. J. Jones & Co." A few days after the sale Mr Jones asked me to make out the deed in his own name. I replied that I could not, or would not, but must follow the conditions of sale. Michael Burke was at the sale. A good deal of conversation between Snevily and me about the sale of this property. John Snevily said they had entered into an arrangement to pay $16,000 for the property. This was a day or two before the sale. Before the deed was acknowledged, Snevily called at the office to see what was the fourth part or share of the purchase money. He was answered by stating that Jones had left a check for the full amount of the purchase money. This was before the acknowledgment of the deed, and after Jones told me to make the deed to him. The sale was fairly and openly conducted, and ample time was given for all bidders. I do not remember who the other bidders were. A great many persons present. My impression is the tavern-house was first sold. I saw Martin during the day.

Charles L. Berghaus sworn. I was in the office of Mr Snevily on the day of the sale. Mr Martin came in there and went in the back room and came out; Snevily said, "Martin, I want you to repeat the bargain between Jones, Fenn, yourself, and myself." It was the morning before the sale. He said they had agreed to pay $16,000 for the property, whether it brought that at the sale or not, in order to satisfy me, Snevily's judgments, and the judgments of the other parties against the property. This was the arrangement among themselves. Martin had some arrangement with Snevily. Snevily was not to bid; but if the property did not bring $16,000 they were to pay $16,000 any way in order to satisfy Mr Snevily's judgments. This was the day of the sale

[Smull v. Jones.]

that this conversation took place. I was not at the second sale. I knew of the sale. The object of this arrangement was to save their judgments, so that Snevily should be satisfied. The fixing the arrangement amount at $16,000 was among themselves. The tavern-stand was referred to in the office. I asked Snevily why he did not bid it up to the $16,000 at once; he said, because there were some intermediate judgments, and they would have them to pay; but if they got the property, the $16,000 would cover all his judgments.

John Snevily again. If the arrangement had not been gone into I would have bid it to $16,000, if any person had bid against me to that amount, if it had gone as high as that, to cover my own judgments; if it had not gone so high, it was not to be bid to $16,000, unless there were opposing bidders; but if it was bid up it was to bid to cover Fenn's judgments; my judgments were to be paid out of the property. The property was to be estimated at $16,000, and bid to that amount. If we bought the property each was to have the amount of his judgments. This bid of $16,000 for all the property. I agreed to release Smull of my judgments. This was between Smull and me; but there was nothing said about its effect upon Smull in this arrangement. Jones was to bid up to the amount of my judgments, Fenn said $16,000. Jones was to bid to the amount of Fenn's judgments and mine. The agreement was, that Jones was to bid off the property to save our judgments. Fenn fixed the estimate at $16,000. I had made up my mind to cover my judgments against Smull; and they were to be paid out of the property. After the sale, some time after Jones gave the paper, he thought my judgments ought not to be paid. Some of my judgments were the first, and some the last on the property. Mr Jones had paid me no part of my judgments. Mr. Smull has paid me $400 on those judgments.

P. C. Sedgwick sworn. Mr Snevily told me of this arrangement, and I think Mr Fenn told me about it. My impression is that Fenn told me, but am not certain. I understood these four men were going to purchase this house and property, and they were to give $15,000 or $16,000; that was the arrangement among themselves. They were to bid it to that sum if there were opposing bidders. This was before the sale that I knew it. It was a matter spoken of among business men. If it was not bid to $16,000, they were to pay each other's judgments to that extent.

Berryhill Bell's deposition. Two years ago last fall, at the time John Smull's tavern-stand was sold, I had some thoughts of purchasing the property, and mentioned it to John Snevily some time before the sale; he told me, they, as witness understood, the judgment creditors, would put it up to $15,000 or $16,000. In consequence of this I did not attend the sale, as that was more than I intended to give for it. I think I had some conversation with Theophilus Fenn pending the motion to set aside the former sale.

He wished me to attend the second sale and bid for it; but afterwards I had the conversation referred to with Mr Snevily, and did not attend the sale. I thought it was not worth while. I have no recollection of having any conversation with any of the other judgment creditors. I understood Mr Snevily when he used the word "they" to refer to the other judgment creditors.

Question.—What sum had you a mind to bid for the property had you attended the sale?

Answer.—Between $12,000 and $13,000.

Question.—Were you in Dauphin county at the time of the sale?

Answer.—I was; I lived about fifteen miles from Harrisburg.

Question.—Who was present when you had the conversation referred to in your deposition?

Answer.—I do not remember any person being present.

Question.—Did you know all the judgment creditors and their amounts?

Answer.—I cannot say that I did. I knew Snevily, Jones, and Fenn were judgment creditors, but not the amount. I understood that Mr Trimble had a mortgage, or owned part of the property.

Achison Martin's deposition. I think on the day of sale, or the day before, of John Smull's property in Harrisburg, it was the tavern-stand and other property, John Snevily called me into the house and asked me whether I would buy the property; I told him I did not know. He called me into the back-room, and then told me that if I would go in with them, Snevily and Jones, and he might have mentioned some other names, I don't recollect; he then showed me some judgments against John Smull, and told me that if I would go in with them to buy the property, he would give me time to pay my part of the judgments. I don't recollect whether I mentioned to him or he mentioned to me, that the property was to bid up to $16,000; then Snevily told me that he would take my notes for my part. Snevily and I went from there to Mr Jones's store; Snevily then told me that Mr Jones was going in along. Mr Jones was in the store. Mr Snevily went up to him and spoke to Mr Jones, told him that I was going in along. Mr Jones said that he had no objection. Snevily said to Mr Jones that he was agoing to take my notes. They then commenced talking about it, and I stepped aside. Snevily then told me that Mr Jones was to bid on the property; that he would bid it up to $16,000. There was something more said, but I don't now recollect what it was. I think Mr Jones and I had no conversation about this matter before the conversation Snevily and I had. I had no conversation or correspondence with Mr Fenn before the sale of the property. I think I might have thought to buy the property; but I know that I would not have bought it. I told John Snevily that I have some money coming to me; that if I

[Smull v. Jones.]

could get my money, I might buy the property. I think I told him that if I had all my money I would buy it; I think I told him that I could raise the money, but I am not certain. I talked to Snevily about raising the money; I might have told him I could raise the money in a short time, but don't recollect. I don't recollect whether this last conversation was before or after Snevily proposed to take me in as a partner. I understood from Mr Snevily that it was the tavern of John Smull, and a lot connected with the tavern which was to bring $16,000. He mentioned something about other property; all was to go to $16,000. I don't think that I would have bid on the property if there had been no arrangement between Snevily and Jones; I might have thought of it.

Cross-examined—I was not present at the sale. I was not kept away from the sale by any thing that happened between Jones and Snevily. Jones was not present at the conversation between Snevily and me. I don't recollect of Jones making any agreement, except that he was satisfied with my going in. I don't recollect that Jones said that he would bid on the property. Snevily told me that Jones was to bid on the property. I don't think that Jones said that Snevily was to be interested in the property. Mr Jones might have said something else about it, but don't recollect what he said. I don't think Mr Jones said who were to be partners, or what shares they were to have, but I thought from what Snevily said, it was to be us three; I did not consider that I was bound from what happened at Jones's store to go into the purchase. I did not hear Mr Jones make any bargain with Mr Snevily or myself, except what I have stated. I did not hear Jones say what part Snevily was to have, but I thought us three were to buy it. I don't recollect that I heard Mr Jones say what the property was to be bid to. I don't recollect that it was mentioned in the store that the property was to be bid up to $16,000. It might have been mentioned. I don't know that I ever heard Jones say that he would bid the property up to $16,000. I never asked him, that I recollect of. Since the sale I made no claim to the property, and did not care any thing about it, and never troubled myself any thing about it. I think Mr Fenn's name was not mentioned in reference to the property, that I recollect. It might have been mentioned. I did think that I might be disappointed in getting my money, and thought it would not suit me to buy the property. (Question; do you know of any fraud on the part of Jones? Question objected to.) There might have been, and might not have been; I don't know of any. (Question by plaintiff's counsel;) Jones did not say in the store that neither I nor Snevily should have a part of the house.

The plaintiff then gave in evidence that the first sale to Michael Burke was for $4470, and that it was set aside by the court on the following offer:

I. — M

[Smull v. Jones.]

" September 3d 1838.  In the case of the tavern establishment of John Smull, and sale of the same by the sheriff.

" In the event of the court setting aside the sale by the sheriff, we promise to bid in case of a resale $1500 more than it sold for to Michael Burke, and engage and promise to pay the same to the sheriff of the county.

" THEOPHILUS FENN,

" JOHN SNEVILY,

" A. J. JONES."

The sale was made subject to a mortgage for $6000.  The plaintiff also gave in evidence the record of many judgments not covered by the sheriff's sale of the property to the present defendants.  It also appeared that Mr Smull took exception to the acknowledgment of the deed to the present defendants, but the exceptions were overruled.

The court thus charged the jury:

· This is an action of ejectment brought to recover certain valuable property in this town, of which the plaintiff was the original owner, and which was sold on judgments against him by the sheriff of this county.

There is no dispute about the respective titles of the respective parties on the face of the papers, and that so far as a paper title is to decide the cause, the defendants have a superior claim.

The counsel for the defendants have submitted a point of law on which they ask a specific direction to the jury, which, if answered in their favour, relieves the jury from all embarrassment, and from drawing any conclusions from the parol evidence.  It is in these words: " That if they believe the testimony of John Snevily and the other witnesses, and testimony in the cause, the plaintiff has not proved a fraud that will vitiate the defendants' title, and the plaintiff cannot recover."  The court answer this in the affirmative, as follows: If the jury believe that Jones, Fenn and Snevily were judgment creditors of Smull, and they entered into such an arrangement as has been testified to by Snevily to bid the property up to $16,000, its full value, to secure their claims and judgments, (provided there were opposing bidders) and they to become tenants in common of the property should it be stricken down to them, or one of them, it is not such evidence of fraudulent combination to suppress bidding at the sheriff's sale as renders it void in law, or would authorize the plaintiff to recover under the facts now disclosed.  Their object seems to have been the security of their debts or judgments against Smull, and not to oppress him, or to prevent any one from bidding.  Jones was to bid the property higher than he did, if there were others who wanted the property.  It seems from the record that they had various judgments upon the docket, interspersed among the liens of others.  The property was valuable, would command a

[Smull v. Jones.]

high price, and probably no one of them felt able to pay so large a sum of money; but if he took an interest in the property instead of the money on his judgment, and became interested with others, he could secure his claim, and on a future sale of the property on credit, he might eventually get his money. It is not a fraud on Smull. It seems from the record that more than $5000 was paid into court, and distributed among the creditors of Smull. The deed was acknowledged, his legal title was taken away, and he now asks to be relieved from the effect of that sale. He has not tendered the money to Jones. He has not brought the money into court and offered it here, but seeks to recover the property, take the $5000 to pay his debts, as it has been applied thereto, on such a case as is presented. This court think, as the case now stands before the jury, he ought not to recover against these defendants.

Errors assigned:

1. The court erred in charging the jury, that if they believed the testimony in the cause, the plaintiff did not prove a fraud that would vitiate the defendants' title.

2. The court erred in the charge by stating that it was necessary for plaintiff to have made a tender before suit brought of the purchase money to defendants, and to have brought it into court to entitle him to recover.

3. The court erred in rejecting the evidence proposed to show that Jones and Fenn have denied since sale that Snevily has any interest in the property, and that Jones has also denied the signing of any paper acknowledging Snevily's interest.

4. The court erred in charging the jury as follows, speaking of defendants Jones and Fenn: " Their object seems to have been the security of their debts, or judgments against Smull, and not to oppress him or to prevent any one from bidding."

*Roberts* and *Rawn*, for plaintiffs in error.

The effect of the arrangement between Snevily, Jones, and Fenn, was to prevent a competition in bidding, and therefore fraudulent, 1 *Story's Eq.* 290; 3 *Johns. Cas.* 29; 4 *Johns.* 254; 6 *Johns.* 194; 8 *Johns.* 444; 13 *Johns.* 112; 2 *Hammond Rep.* 510. (*Ohio*).

If the sale was fraudulent, no title passes, and therefore no necessity for making any tender of purchase money. 2 *Watts* 67; 10 *Watts* 139.

*M'Cormick* and *M'Clure*, for defendants in error,

Contended that an agreement among creditors to bid up the property offered for sale by the sheriff was not fraudulent; and this was nothing else. It appeared that Smull gave for the property about $9540, and that the sale by the sheriff to the present defendants was for about $13,000, including the mortgage to which it was sold subject. Cited, 4 *Yeates* 341; 11 *Serg.*

*&· Rawle* 141. Fraud is a question of law to be decided by the court. 9 *Johns.* 337. But in this case it appeared that Mr Smull excepted to the sheriff's sale and confirmation of it by the court; and this is conclusive.

The opinion of the Court was delivered by

GIBSON, C. J.—It is not to be doubted that lien creditors, as well as others, may purchase jointly at sheriff's sale, if all be open and fair. A combination of interests for that purpose is not necessarily corrupt; and if it be forbidden, it must be by some principle of public policy. It certainly has an influence on the biddings, by suppressing competition; but it often does less harm than good. It does no good where the property is put up in small lots; but it may do much where the estate is beyond the means of the bidders singly. Where the debtor or a particular creditor happens to be prejudiced by it, without an improper design, he must bear it as he would a prejudice from a *bona fide* pursuit of a supposed right; such as an arrest for a groundless debt, not believed to be such. On the other hand, a combination not for the convenience of the parties in enabling them to cut up the property, if it should be too much for one of them, or in putting their means together, if the price should be too much, but to get the property at an undervalue, by hindering it from having a fair chance in the market, would be fraudulent, just as a combination with a debtor to purchase his property for a full price, in order to keep it from his creditors, would be fraudulent. In neither case would the purchase be the legitimate exercise of a right, but an abuse of it; and it would consequently be void. Now, as men may unite for a bad purpose as well as a good one, and as their power to accomplish it is incalculably increased by preconcert of action and combination of means, their motive for it, in such a case as this, cannot be too severely scanned. They may lawfully regulate the course of their bidding beforehand, and as secresy is not indispensable to honesty, they may openly declare how high they mean to go, provided the object be not to deceive or deter those who may be their competitors. There is no confidential relation between bidders; and that being so, the law requires no more of them than fairness of purpose, and that no trick or contrivance be used as a scarecrow. Their interests are necessarily adverse; and where a person who intended to bid, absents himself from the sale, because he has been told that more will be offered than he is willing to give, it is his own affair. If the property goes below the expected price, his absence is the cause of it; and if it would have reached it, had he been present, he was not deceived: in either case, who is wronged? It is, as I have said, the end to be accomplished, which makes such a combination lawful or otherwise. If it be to depress the price of the property by artifice, the purchase will be void; if it be to raise the means of payment

[Smull v. Jones.]

by contribution, or to divide the property for the accommodation
of the purchasers, it will be valid; and on this distinction the
cause ought to have been put to the jury. But in answer to a
prayer for direction, the judge charged that the plaintiff had not
proved a fraud, and that an agreement by particular creditors to
manage their bids so as to secure their liens is not evidence of
fraud. This, without adverting to the means to be employed,
tended to mislead, by diverting the attention of the jury from
those circumstances which furnished a motive for the youngest
of those creditors to have the property struck off at the lowest
price. It was testified that the judgments of the associates were
to be paid out of the actual price, in the proportion which each
of those judgments bore to the largest sum agreed to be bid; the
object of which was, to squeeze out the intermediate judgments,
by getting the property at a price which would not reach them
in the ordinary course of appropriation; but which would, by
force of the agreement, give their proportion of what was to be
considered the actual price between the associates, to judgments
posterior to them. Such an agreement being inconsistent with
sound policy, is not to be tolerated; and the jury ought to have
been directed to find for the plaintiff, if its existence was made
out to their satisfaction by the proof. It is vicious, not because
it gives the younger lien creditors a place in the partnership, but
because it gives them a bonus for standing out of the way of the
particular design; for it will not be said that a bidder who has
bought off his competitors, whether with a share in the specula-
tion, or a direct bribe, can hold the property against a debtor
who has been injured by it. He might perhaps hold it against
another lien creditor, whose business it was to take care of him-
self by bidding the property to an amount sufficient to protect
him, if it were worth it; but the debtor has no such preventive
means, and whether he be insolvent or not, the consequences to
him are the same, because his person and future earnings remain
exposed to execution, for at least a part of the debts which ought
to have been discharged by his property. There were other cir-
cumstances, also, which might have been left to the jury for
what they were worth. Snevily offered Martin a share in the
purchase, with the assent of Jones, and told him the amount
agreed to be bid. Martin, it seems, would not have bid at any
rate; but this desire to bring into the measure those who were
supposed to have a view to the property, may cast a ray of light
on the motive of those who originated it. The judge, however,
committed a very decisive error in relation to this part of the
case by rejecting evidence to prove that, since the purchase,
Jones and Fenn have repudiated Snevily's claim to participate in
it. Snevily testified, that he would himself have bid the property
to an amount sufficient to cover all his judgments; and, to divert
him from his purpose, by giving him an interest which would

I. — 18　　　　M *

make the execution of it unnecessary, and then to deprive him of the interest when his purpose could no longer be accomplished, would go far to convince the mind that the measure was a lure to keep him from spoiling the game. When it is incumbent on a party, not only to prove the existence of fraud, but to prove it by circumstances, every act connected with the transaction, however remotely, ought to be put before the jury. But to make the transaction fraudulent, in this instance, it must amount to a conspiracy to depress the bidding. There are many acts which are lawful when done by one person, and culpable when done by more than one; and this, whether the end be gain to the confederates, or injury to the party. Of this stamp, is a combination of journeymen to raise their wages, or to work only on certain conditions; and Hawkins says, (*b*. 1. *c*. 72, *sec*. 2.) there can be no doubt, that all confederacies wrongfully to prejudice another, are highly criminal by the common law. If there has been such a confederacy in this case, it will undoubtedly avoid the sale.

Then the jury were told that it was incumbent on the plaintiff, in any event, not only to bring into court the amount which the defendants have paid, but to have. tendered it to them before suit brought. But it is to be borne in mind, that the plaintiff's title, if he has any, is a legal one. A covinous conveyance is no conveyance at all against the party intended to be defrauded by it, as was said in *Gilbert* v. *Hoffman* (2 *Watts* 67) and the authorities there cited. Where a court of equity has set aside a conveyance for fraud, it has indeed sometimes directed a reconveyance *ex majori cautela*, as in *Barnsley* v. *Powel* (1 *Ves*. 284); but that a reconveyance is unnecessary, is shown by *Bates* v. *Groves*, (2 *Ves. Jr.* 294); and *Hawes* v. *Wyatt* (3 *Bro. C. C.* 156). Having a complete title, then, before tender, all that could be required of him, according to *Wolfley* v. *Snyder* (8 *Serg. & Rawle* 328), would be to have the money in court at the trial. But would he be bound even to do that? It is a maxim that he who has done iniquity shall not have equity; and the only apparent exception to it is the case of an offender coming into court for relief, who must himself first do what is right; but that is on the ground of another maxim, that he who will have equity must do equity: and it is in truth no exception at all. At all events, he can demand nothing of a party who stands on a legal title and asks nothing of him in return; nor can he get back what he has paid by restoring what he has unjustly gained. The authorities to the point are positive and direct. In the first place, it was so ruled by this court, in *Gilbert* v. *Hoffman*, already cited, for reasons not easily to be controverted; and if the authorities there relied on needed corroboration, many more might be added to them. In *Rich* v. *Sydenham* (1 *Ch. Ca.* 202) a plaintiff who had got a bond from a defendant of 800*l*., when he was drunk, for 50*l*. lent, filed a bill to have the defendant's trust estate in right of his wife

[Smull v. Jones.]

subjected to the debt; but relief was denied him, even for the sum actually due. So, in *Warden* v. *Beresford* (1 *Vern.* 452), the Lord Chancellor disallowed the defendant's whole claim, only because he had opened a bundle of papers in relation to it, which were entrusted to him for safe keeping, and had at first suppressed some of them, which were however afterwards produced by him. On the same principle is *Mildmay* v. *Mildmay* (1 *Vern.* 53); where a husband, who, having granted certain rents to the use of his wife, had bought in the estates of the tenants, by which the rents became irrecoverable at law, was not decreed to make them good, because she had eloped from him, though she offered to return and cohabit with him. The general principle, therefore, seems to be conclusively settled; but as its application to the case before us was not made a point at the trial or on the argument here, we wish not to preclude discussion upon it, should the cause come up again. For reasons independent of it, however, the parties must go before another jury.

Judgment reversed, and a *venire de novo* awarded.