## Oram *et al. versus* Rothermel *et al.*

1. In an ejectment to test the validity of a title acquired at sheriff's sale, which is attacked on the ground of fraud at the sale on the part of the purchaser, evidence is inadmissible to show what occurred at a subsequent sheriff's sale of the same defendant's property in another county.

2. A., being the purchaser at sheriff's sale of a leasehold sold as the property of X., brought ejectment therefor against B., C., and D., partners, who claimed under a previous sheriff's sale of the said leasehold as the property of the same defendant. After suit brought, A. died, and his administrators were thereupon made parties. B. also died, and his executors were brought in by scire facias, but did not plead nor take any part in the suit. On the trial plaintiffs attacked the validity of the defendant's title on the ground that said defendants had perpetrated a fraud at the sale. One of the defendants, C., being offered as a witness to contradict the allegations of fraud by testifying as to what took place at the sale and subsequently prior to the death of either A. or B.,—*Held,* that neither the death of A. and the devolution of his title upon his administrators, nor the death of B. and the devolution of his title upon his surviving partners, rendered C. incompetent to testify under that clause of the Act of 1869 which excepts from the operation of said act, cases where the assignor of a chose in action is dead. *Held* further, that the fact of B.'s executors being made parties to the record did not render C. incompetent to testify under that clause of the said Act which excepts from the operation thereof cases where executors or administrators are parties, because B.'s executors were unnecessarily made parties and should not properly have appeared upon the record. *But held,* that under the provisions of the last mentioned clause of the said Act the substitution of A.'s administrators as parties to the record did render C. incompetent as a witness, and that therefore his evidence was properly rejected.

3. In ejectment against partners it is improper and unnecessary if one partner die pending the suit to make his executors parties thereto. The title devolves upon the survivors, and the ejectment should be prosecuted against them alone.

4. Neither party to a suit can by causing improper parties to be placed upon the record take from his opponent the right to be examined as a witness, if otherwise entitled thereto.

5. *Semble,* that administrators in bringing ejectment for a leasehold, alleged by them to be the property of their intestate, are not bound to set forth their representative character on the record, but it is perfectly proper for them to do so.

[Oram *v.* Rothermel.]

6. The purchase of a judgment by another judgment creditor at a judicial sale, with an understanding or agreement that the vendor shall not bid, does not render a sale of the property to the vendee of the judgment absolutely void, without regard to whether a fraud was contemplated or committed by him. It is for the jury to say from all the circumstances whether a fraud was contemplated or committed. If it was, the sale is void.

7. The same doctrine applies where it appears that the purchaser at a judicial sale has represented to those present that he proposes to buy for the defendant, and so prevents competition, or where he produces a like result by promising to pay claims against defendant. Such action on the part of the purchaser does not amount to fraud *per se*. It is for the jury to say whether the statement and promises made by him were false or true. Only in case they were false was his conduct fraudulent and the sale void.

8. Where a judgment creditor at a judicial sale prevents others from bidding by representing that he purposes to buy the property in, reimburse himself from the profits thereof, and then hand it over to the defendant, the fact that two months after the purchase by him he fails, on application of said defendant, to hand over the property, he not having yet realized therefrom his claim against defendant or had tender made him by defendant of the full amount of said claim, is not sufficient evidence to submit to a jury from which they may infer that the representations made at the sale were fraudulent and untrue, and that therefore said judgment creditor's title is void.

9. *Semble*, that where the administrators of the plaintiff in an action have been substituted on the record they should properly on the trial of the cause produce their letters of administration. But if the defendant desires to take advantage of their failure so to do, he should present to the judge a point requesting him to charge that plaintiffs are not entitled to recover on account of that omission. If he present a point to the effect simply that plaintiffs cannot recover, without assigning a reason, which the judge refuses, the supreme court will not reverse on error.

June 9th 1881.   Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Error to the Court of Common Pleas of *Northumberland county :* Of May Term 1880, No. 78.

Ejectment, by Joseph K. Maurer against John B. Douty, Thomas Baumgardner and William H. Douty, for a certain colliery known as the "Benjamin Franklin Colliery." The writ was issued November 4th 1873. On November 20th 1873, the death of defendant, John B. Douty, was suggested. On April 2d 1878, the death of plaintiff, Maurer, was suggested, and his administrators, Samuel H. Rothermel and Aaron W. Maurer substituted. On April 6th 1878, the surviving defendants, Baumgardner and William H. Douty, pleaded "not guilty." On July 9th 1879, a scire facias issued to bring in William B. Kutzner and William H. M. Oram, executors of John B. Douty, defendant, deceased. Said executors were by order of court

made parties to the suit, but filed no plea, and took no part therein.

On the trial of the cause, before ROCKEFELLER, P. J., the plaintiffs deduced title from the Commonwealth to one Charles P. Helfenstein, and then proved a lease from Helfenstein to one Richard B. Douty. They then further proved the recovery of a judgment by their intestate Maurer against said Richard B. Douty in 1873. They also proved a sheriff's sale of the leasehold in question to their intestate on July 25th 1873, for $95, under a fi. fa. issued by him upon the above judgment. They did not put in evidence their letters of administration, but rested.

Defendants also claimed title through Richard P. Douty, and proved a sheriff's sale of the leasehold in question to them on March 4th 1873, which sale took place under several executions issued upon judgments previously obtained against said Richard B. Douty. Defendants then rested.

Plaintiffs, in order to disprove the validity of defendant's title, then introduced evidence with reference to the circumstances attending the sale of March 4th 1873, which was substantially as follows : Richard B. Douty acquired title to the leasehold in question in 1868. Upon attempting to run the colliery he soon involved himself in debt. Judgments were obtained against him, and he applied at various times to his brother, John B. Douty, his nephew, William H. Douty, and Thomas Baumgardner, the defendants, for assistance. They all three assisted him frequently by going his bail for stay of execution, in some cases, and paying the judgment when the stay expired and taking an assignment of the judgment, in other cases by buying judgments against him and staying the executions, by indorsing his paper to a large amount and taking it up when due, and by advancing him large amounts in cash at different times. In this way defendants became the creditors of Richard B. Douty to the amount of about $60,000.

Other creditors also had claims against Richard B. Douty, some of which were reduced to judgment. Among these creditors was Samuel H. Rothermel, who, having obtained a judgment for $2,111.12, caused a fi. fa. to be issued on January 6th 1873, against the leasehold in the colliery in question, and also against all the personalty on the premises. On the following day John B. Douty and Thomas Baumgardner, defendants, also issued writs of fi. fa. against the same property upon twenty-five several judgments, held by them against Richard B. Douty, which aggregated in amount $17,293.61. Prior to the sale all three of the defendants had numerous conversations with

Richard B. Douty, the purport of which was that they wished only to reimburse themselves, by means of the sale, the sums of money laid out by them on his behalf.

The sheriff's sale was largely attended. Defendants were all present, and also Maurer, plaintiffs' intestate. Several persons, among them one Morgenrath and one U. S. John, testified that they went to the sale purposing to bid $25,000 for the property. One George W. Betz testified to the same intention on his part, and also that Maurer had informed him that he proposed to bid a like sum. John B. Douty, one of the defendants, openly said at the sale that he and the other defendants proposed to buy the property in to cover themselves, and that, when they got their money out of it, they intended to give it back to Richard B. Douty. Some witnesses testified that he said defendants were buying the property for Richard B. Douty, and also that he asked persons present to refrain from bidding. In consequence of these representations and solicitations Morgenrath and John did not bid, and Betz having bid a small sum, refrained from running the property up higher. Maurer acted in a similar manner, being partly prompted, one witness testified, by a promise on John B. Douty's part to pay the amount of a debt due him by Richard B. Douty if he would cease bidding. Scott & Sons, who were mortgage creditors of Richard B. Douty to the amount of $10,000, and also large judgment creditors in Schuylkill county, bid up to $16,000. Several witnesses testified that John B. Douty then went to Scott & Sons and expostulated against their bidding further. Finally, they agreed to assign their claim at 75 per cent. of their face value to John B. Douty, and to cease bidding. This they did and the leasehold and personalty were finally sold to defendants for the sum of $21,500. The value of the leasehold alone was, in the opinion of several experts produced by plaintiffs, at least $50,000.

Defendants after their purchase formed a partnership to work the colliery, and continued to operate it down to and after the time of the bringing of this suit. No considerable amount of profits was realized by them, but a good deal of expense was incurred in making permanent repairs and improvements upon the property. Richard B. Douty testified that in the May following the sale he had conversations with two of defendants, which he narrated as follows:

"I went and saw my brother, John B. Douty, and I told him, says I, 'John, I have been sent here by a party who is able, to ask you if you will take dollar for dollar, with interest to date, for your claims against me, and leave the colliery come

back to me.' Says he, ' Who would be fool enough to do that ?'
Says I, ' Never mind, the man is able to make his word good.'
And he talked then about how he had been kept out of his
money by this arrangement, that he had calculated to build an
opera house and one thing and another like that, now he couldn't
get his money. Says I, ' John, you have a chance to get your
money.' He said he wouldn't do it. Then I says to him, now,
says I, John, ' I don't know what more any honest man would
want than dollar for dollar, with interest to date, says I, strang-
ers, let alone being brothers. That wouldn't do, he wouldn't
take it. I came down to Weaver's Hotel. I met Mr. Baum-
gardner in the office or just coming in the office of the hotel
there. Says I, Mr. Baumgardner, will you take dollar for dol-
lar for your claims against me ; dollar for dollar, with interest
to date ? No, he wouldn't, he wouldn't have anything to do
with it."

One Reuben Fageley being examined testified that he had
authorized Richard to make the offer detailed above, thinking
that the amount of Richard's indebtedness to the defendant was
from $18,000 to $20,000.

The plaintiffs offered in evidence the record of a judgment
obtained in Schuylkill county, by John C. Scott & Sons against
Richard B. Douty, to show the indebtedness of the defendant
therein, and also offered to prove the sale of said defendant's
real and personal property in Schuylkill county under said
judgment after it had passed into the control of the defendants
in the present suit. Objected to by defendants. Objection
overruled and evidence admitted. Exception. (First assignment
of error.) Plaintiffs then closed.

Defendants then offered Baumgardner, the defendant, as a
witness to prove what took place at the sheriff's sale of the
leasehold to them, and also as to the conversation testified to by
Richard B. Douty. Witness objected to by plaintiffs as incom-
petent for the reason that all the evidence of Richard B. Douty
related to a period anterior to the death of John B. Douty,
which occurred November 15th 1873, and prior to the death of
Joseph K. Maurer, who died July 9th 1875, and the executors
and administrators of both of deceased parties were parties to
the present suit.

THE COURT.—" The plaintiffs object because they say the
witness is incompetent under the Act of 15th April 1869, and
argue that the assignor of the thing or contract in action is dead,
and that the suit as it stands is an action by or or against ex-
ecutors or administrators, etc. I am of opinion that if Richard
B. Douty, the lessee, was dead, and his interest had passed by
assignment or sheriff's sale, in a suit by his assignee, Helfen-

[Oram v. Rothermel.]

stein, the lessor, could not be a witness under the act, for the case would then be ruled by the case of Karns v. Tanner (16 P. F. Smith, 297). Joseph Maurer, I think, cannot be said to be the assignor of the thing or contract in action. He was not a party to the lease. His estate has an interest in the thing, but the assignor of the thing or contract in action and also the assignee or lessee are both living. If the defendants and Joseph K. Maurer both claimed under Richard B. Douty, and he, the said Douty, was dead, perhaps the case would be something like Diehl v. Emig (15 P. F. Smith, 320). There the alleged assignor of the thing or contract was dead. The plaintiff, who was offered as a witness to prove the deed or contract, was contesting the title of the executors of such alleged assignor. But it is argued that, although, as the record now stands, the suit is between these defendants who are living and the administrators of Joseph Maurer, deceased, it is not a case that properly comes within the proviso to the 1st section of the Act of 15th April 1869, because the administrators could have brought an action of ejectment in their own names, that they were mere trustees, and if they had brought suit in their names as administrators, the word administrators would have been mere surplusage, and that by bringing suit as administrators they could not deprive the opposite party of their right to give evidence. All the late cases decided by the Supreme Court of this state treat actions brought in the lifetime of both parties, but where one dies and his executors or administrators are afterwards substituted as parties, as actions by or against executors, administrators, etc. I was at first inclined to adopt the views of counsel of defendants, but an examination of the authorities satisfies me that the suit could have been brought by the administrators as such. All interests arising out of land as are denominated chattels real, go to the executor or administrator, and not to the heir. This includes all estates for years, however long the period of their duration (3 Redfield on Law of Wills, 142). Where the testator holds a term for years it will rest in the executor and he is obliged to accept of the same (143). The personal representatives of a termor may maintain ejectment where the testator had a lease for years, or from year to year, whether the ouster was before or after his death. See cases cited (1 Williams on Executors 706). According to those authorities, I think the action could have been brought in the names of the present plaintiffs. The 3d section of the Act of 13th April 1807 (Purdon 534, pl. 12), provides that "No writ of ejectment shall abate by reason of the death of any plaintiff or defendant, but the person or persons next in interest may be substituted in the place of the plaintiff or defendant who shall

2 OUTERBRIDGE—20

have died, pending the writ." This action having been brought to recover possession of an interest arising out of land, denominated a chattel real, which, upon the death of the lessee or termor, went to his executor or administrator. That being so, these administrators were the persons next in interest. They were properly substituted in the place of the plaintiff. If they could not have been so substituted as to the persons next in interest it would in my opinion be hard to tell who would be the proper persons to substitute. If I am correct in this, then this is now an action by administrators, and the parties to the action who are living are incompetent to testify to anything that took place before the death of the other party. This is what is offered to be proved. Both parties admit that the offer is to prove what took place before the death of either John B. Douty or Joseph K. Maurer. On the subject of those administrators' right to maintain the action in their representative character, I would further state the rule as it is stated by Chief Justice GIBSON in Kline *v.* Guthart (2 Penrose and Watts 491), that when the action is on a contract with the decedent or for a tort to the goods before they have actually come to the executors' possession it can be maintained by him only on the decedent's title, and consequently only in a representative character, but when it is on a contract since decedent's death or for a tort to the goods in the executors' possession or for converting or detaining them having escaped from his possession, etc., it can be maintained by him only in his own right, and naming him as executor will not change its nature. The text-books and many other cases maintain this doctrine. In the present case the executors or administrators were never in possession of the lease-hold premises. The right of possession, if any there was, was in their intestate in his lifetime. He had brought this suit to recover the possession. He died, and his administrators have been substituted in his place as the persons next in interest. I think it is generally understood that to recover assets of the testator, when the executor never had possession, the suit is to be brought in his representative character. There, the intestate's right, if any he had, to the lease or term of years, belongs to these plaintiffs, as administrators. They never had possession, and may not be able to dispose of it, unless they can recover possession. The cause of action is not one, in my opinion, that sprung up or was created since the decedent's death. For a bond or a horse that had been taken out of the decedent's possession in his lifetime, and which had never been in possession of the executor or administrator, the suit would probably be brought in their names in their representative character, and if this is so, why can not an action be brought in the same manner to

recover chattels real or term of years, the possession of which had never been in the executors or administrators.

"For these reasons the objections are sustained and the evidence rejected. Exception. (Second and third assignments of error.) Defendants then closed.

The plaintiffs requested the court to charge, inter alia, as follows:

"*Second.* Public policy requires that all judicial sales must be open to free and fair competition, and that an agreement by a bidder at sheriff's sale to pay the claim of another, or to purchase said claim, if the other would not bid, the bidder paying or purchasing said claim being permitted to purchase the property at the sale, rendered such sale fraudulent as to the debtor or his creditors and void. The debtor whose property is taken in execution has a right to have it sold for the highest price that it will bring, and a purchaser who resorts to any trick or device to get the property for less than what it would have sold for at a fair sale, open to free competition, renders the title of the purchaser utterly void as against the creditors of the defendants, as whose property it was sold. And this is true whether such purchaser paid a full price for the property or not: Abbey *v.* Dewey, 1 Casey 413; Slingluff *v.* Eckel, 12 Harris 472." *Affirmed.* (Fourth assignment of error.)

*Third.* If the jury believe that the defendants, or any of them in this action, were upon the premises on the 4th of March 1873, and during the progress of the sale of the leasehold and personal property of the Ben Franklin colliery, stopped the sale, and during such stoppage, purchased the claim of Scott & Sons, who had bid at said sale, upon the condition that said Scott & Sons would not bid again upon the property, and the defendants or any of them bid in said property thereafter at said sale, the title of the defendants is utterly void as against the plaintiffs in this action, and the verdict should be for the plaintiffs for the land and leasehold described in the writ: McMichael *v.* McDermott, 5 Harris 353; Dean *v.* Connelly, 6 Barr 250. *Affirmed.* (Fifth assignment of error.)

*Fourth.* If the jury believe, from the facts in this case, that the defendants, or either of them, were upon the premises, and, during the progress of the sale of the leasehold and personal property of the Ben Franklin colliery, after Joseph K. Maurer had bid upon said leasehold, went to him and induced him to believe that the said defendants, or either of them, were bidding in the said colliery for Richard B. Douty, and by this device and contrivance, or by the promise to pay his claim against Richard B. Douty, Joseph K. Maurer was induced not to bid, and thereafter the property was struck down to the said defend-

ants, or either of them, at said sale, such sale was fraudulent and void against the plaintiffs in this action, and the verdict must be for the plaintiffs, for the land and leasehold described in the writ: Walter *v.* Gernant, 1 Harris 515; Smull *v.* Jones, 1 W. and S. 128; Gilbert *v.* Hoffman, 2 Watts 66.

*Answer.* "This point is affirmed, but I refer the jury to what I have said in the general charge, in regard to bidders or purchasers making representations to induce other bidders not to bid. It is for the jury to determine whether the defendants were guilty of falsehood or trick to prevent persons from bidding at the sale. Did these defendants, or either of them, practice any deceit or imposture, the object of which was to get the property at an under value, or less than what it would have sold for at a fair sale ?" (Sixth assignment of error.)

*Fifth.* If the jury believe, from the evidence, that Thomas Baumgardner and John B. Douty, or either of them, were upon the premises, and, during the progress of the sale of the Ben Franklin colliery, falsely represented to U. F. John, who, with L. B. Morganroth, went to said sale with the intention of bidding up the same to $25,000, who represented the same to said Morganroth, that the said defendants intended to bid in the said colliery for Richard B. Douty, the defendant in the executions, or for his benefit, by which contrivance or device said John and Morganroth would not bid at said sale, and the said defendants, or either of them, purchased said colliery thereafter at said sale, the leasehold for $18,600, and the cars, mules, etc., for $2,900, or thereabouts, such contrivance rendered the title so obtained by the defendants in this action utterly void, as against the plaintiff, who was a creditor of Richard B. Douty at the time. And the fact that said John and Morganroth were volunteers, and expected to pay their bid in cash, and were not creditors of Richard B. Douty, makes no difference, and the plaintiffs are entitled to a verdict for all of the land and leasehold, described in the præcipe: Slingluff *v.* Eckel, 12 Harris 472.

*Answer.* "This point is affirmed. In this point you will observe that the plaintiffs, and properly, we think, use the words, 'falsely represented,' and you will determine, from all the evidence in the case, whether the representations referred to in thiscase, if made, were false." (Seventh assignment of error.)

*Sixth.* That if the defendants, or either of them, falsely represented to bidders present at the sale of the colliery, that they were going to bid in the property for the benefit of Richard B. Douty, the defendant in the executions, and that, after they had got their money out of it, they were a-going to give the said colliery back to the said Richard B. Douty, and that by

[Oram v. Rothermel.]

such device bidders declined to bid upon the property, and the defendants were enabled to bid in the same, without free and fair competition, the title so obtained by the defendants is utterly void, and the plaintiff would be entitled to a verdict: and to determine the truth of such representations, the jury may take into consideration the evidence of Reuben Fageley and Richard B. Douty, that said Fageley had offered, through said Richard B. Douty, to pay the defendants the whole of the defendants' claim, with interest, within two months after said sale, which the defendants refused ; and also, the different statements made by the defendants to same, that they were bidding in the colliery for Richard B. Douty; to others, that they would bid in all the property for Richard, all they wanted was their money out. *Affirmed.* (Eighth assignment of error.)

*Seventh.* If the jury believe from the evidence that the defendants purchased this colliery at the sheriff's sale through any trick or device, at a price less than it would have been sold for if there had been open and free competition a nong bidders, such sale would be fraudulent, and confer no title on the defendants. *Affirmed.* (Ninth and tenth assignments of error.)

The defendants requested the court to charge, inter alia:

First. That the plaintiffs have not shown any title in them to enable them to maintain this action and the verdict should be for the defendants.

*Answer.* " I do not answer this point as requested. I cannot say that if you find the facts, as alleged by the plaintiffs in this case, they would not be entitled to recover the possession of this colliery, as described in the writ of ejectment. Certainly they would be entitled to recover possession of as much land as is necessary to enable them to carry on the business of mining coal, and in the absence of evidence that the whole is not necessary, as against the defendants, they would be entitled to the possession of the whole." (Eleventh assignment of error.)

Verdict and judgment for the plaintiffs, whereupon the defendants took this writ, assigning for error, inter alia, admission of plaintiff's offer of testimony above referred to, the rejection of defendant Baumgardner as a witness, and the answers to the points of plaintiffs and defendants above cited.

*Joshua W. C. Comly* (with whom were *S. P. Wolverton* and *W. H. M. Oram*), for the plaintiffs in error.—The evidence as to the judgment and sheriff's sale in Schuylkill county was wholly irrelevant, both because that judgment was entered in another county from that in which the colliery in dispute was situate, and because the sheriff's sale

[Oram *v.* Rothermel.]

thereunder was several days after the sheriff's sale of the said colliery. The tendency of this evidence was to confuse and mislead the jury. Its admission therefore constituted error: Huntingdon & Broad Top Mountain Railroad and Coal Co. *v.* Decker, 1 Norris 119 ; Albert *v.* Miller, 7 W. N. C. 477 ; Delaware & Hudson Canal Co. *v.* Barnes, 7 Casey 193.

Baumgardner should not have been excluded from testifying on account of Maurer's death. The assignment as to which he was called to testify was the assignment to defendants of the leasehold by sheriff's sale from Richard B. Douty, not as to any assignment by Maurer in his lifetime. In the latter case alone would the provisions of the act of 1869 forbidding a party to testify when the assignor of a chose in action is dead apply. Nor should the witness have been rejected because Maurer's administrators were parties to the record. The statement of their representative capacity was mere surplusage. Nor was the death of John B. Douty or the joinder of his executors sufficient ground to exclude the witness. The defendants having formed a partnership the title to the leasehold of the colliery devolved on the survivors. The joinder of the executors of John B. Douty was therefore improper. At any rate, the capacity of the witness is clear from the provisions of the Act of May 25th 1878, Pamph L. 153, within the spirit of which the case evidently came. It was error to charge that the facts set forth in plaintiffs' various points constituted fraud per se on defendants' part so as to invalidate their title. Their conduct was consistent with perfect good faith, and it should have been left to the jury unincumbered by binding instructions, to find whether they had not intended to act in perfect good faith.

Defendants' first point should have been affirmed. Plaintiffs had failed to put in evidence their letters of administration, and thus there was a link missing in their title.

*James Ryon* (with whom were *George Hill* and *S. B. Boyer*), for defendants in error.—The evidence as to the judgment and sheriff's sale in Schuylkill county was legal and competent: Gibbs *v.* Neely, 7 Watts 306 ; Peterson *v.* Speer, 5 Casey 491 ; McCaskey v. Graff, 11 Harris, 321.

Baumgardner was incompetent as a witness because both Maurer and John B. Douty were dead and their administrators and executors respectively parties to the action : Brady *v.* Reed, 6 Norris, 111 ; Eilbert *v.* Finkbeiner, 18 P. F. S. 243 ; Karns *v.* Tanner, 16 P. F. S. 297 ; Pratt *v.* Patterson, 3 W. N. C. 161 ; Evans *v.* Reed, 2 Id. 175. And also because John B. Douty, one of the copartners of Baumgardner, was dead, and as one of the surviving partners the right and liabilities of John B. Douty

[Oram v. Rothermel.]

by operation of law devolved upon the surviving partner: Hanna v. Wray, 27 P. F. Smith 27; Standbridge v. Catanach, 2 Norris 368; Hogeboom v. Gibbs, 7 W. N. C. 399; Karns v. Tanner, above; Diehl v. Emig, 15 P. F. Smith 320.

Baumgardner was disqualified on the ground of interest, as well as because he was a party to the action: Cambria Iron Co. v. Tomb, 12 Wright 394.

Any agreement at a sheriff's sale whereby competition is destroyed and the sum realized therefor decreased, is fraudulent per se: Smull v. Jones, 1 W. & S. 128; Gilbert v. Hoffman, 2 Watts 66; Seylar v. Carson, 19 P. F. Smith 181; Abbey v. Dewey, 1 Casey 416; Walter v. Gernant, 1 Harris 515; Sharp v. Long, 4 Casey 433; Staines v. Shore, 4 Harris 203.

Defendants' point was not perspicuously drawn. But at any rate plaintiffs were not bound to produce their letters: Axers v. Musselman, 2 Browne 115. If defendants had wished them produced they should have pleaded so as to put the granting of them at issue: McKimm v. Riddle, 2 Dall. 100. No objection having been made by defendants to the substitution of plaintiffs' administrators they will be held to have acquiesced therein: Fritz v. Evans, 13 S. & R. 16.

Mr. Justice Paxson delivered the opinion of the Court October 3d 1881.

The first assignment of error is sustained. The issue trying was whether the title of the defendants below, acquired by means of a sheriff's sale, was fraudulent and void as to the defendant in the execution, and his creditors, by reason of certain acts and declarations of the defendants, at the time of the sale. The property in dispute, and for which this ejectment was brought in the court below, was a leasehold known as the "Benjamin Franklin Colliery," situated in Northumberland county. The offer was to show, by the record of a judgment in Schuylkill county, what the defendants' real and personal property in that county sold for, and what took place at the sale. We are unable to see how the title to the leasehold in Northumberland county can be affected by what occurred at a subsequent sale of the defendant's property in Schuylkill county. If the sheriff's sale in Northumberland was conducted according to law, and the defendants resorted to no trick or device to depreciate the property and prevent competition, they acquired a good title, and it cannot be affected by what took place subsequently in Schuylkill.

The second and third assignments raise but one question, and may be considered together. The court below rejected the defendant, Thomas Baumgardner, as a witness, for the reason

[Oram *v.* Rothermel.] '

that he was incompetent under the act of 1869. He was not rejected upon the ground that the assignor of the thing or contract in action was dead, but because the action was by administrators. At the time the witness was offered, the case stood thus: Charles P. Helfenstein leased the premises in dispute to Richard B. Douty. The interest of Douty was first sold by the sheriff to the defendants, one of whom was the witness offered. The interest of Douty was sold by the sheriff a second time, and purchased by Joseph K. Maurer, who brought this ejectment. Afterwards Maurer died, and his administrators were substituted as plaintiffs. John B. Douty, one of the defendants, died a few days after the service of the writ upon him. More than five years after his death, the plaintiffs' counsel issued a scire facias to bring his executors upon the record as defendants. The executors paid no attention to the writ, never appeared, were never ruled to plead, and no judgment by default was entered against them.

The learned judge was clearly right in holding the witness was not incompetent, because the assignor of the thing or contract in action was dead, and it is unnecessary to add anything to what he has said upon this head. The other branch of the case is not so clear. It may be assumed, however, that the placing of the executors of John B. Douty, upon the record as defendants, does not affect the competency of the witness. The executors were unnecessary parties, and had no business upon the record. When John B. Douty died, his interest in the lease passed to his surviving partner. The executors had nothing to do with it except to see that the surviving partner accounted for its value. The plaintiffs could not, by having improper parties placed upon the record, deprive the defendants of the right to be examined as witnesses, if otherwise entitled thereto.

Since the commencement of this action Maurer has likewise died, and his administrators are upon the record as plaintiffs. The cases show it is not material whether they are there as original or substituted plaintiffs, provided they are proper parties. It was contended they were not necessary parties; that the administrators could have recovered in ejectment had they omitted setting forth their representative character; that the letters of administration were but a link in the chain of evidence to make out their title; that they were under no duty to spread it upon the record, and that its absence could not be taken advantage of, by either plea or demurrer. It may be conceded the plea of *ne unques administrator* would not be a proper plea, and that the action might have been sustained without the administrators declaring in their representative character, yet such

[Oram v. Rothermel.]

admission would not carry with it the principle for which the defendants contend. The administrators were proper parties. The lease was a chattel real and goes to the administrators. The latter were entitled to bring ejectment in their representative character. Being properly upon the record, we think the case comes within the Act of 1869, and that the court below was right in excluding the witness.

The vice of the plaintiffs' second and third points (see 4th and 5th assignments), is that they wholly ignore the question of actual fraud, and by affirming them, the learned judge laid it down as an inflexible rule of law that the purchase of a judgment by another judgment creditor at a judicial sale, with an understanding or agreement that the former should not bid, rendered a sale to the latter absolutely void, without regard to the fact whether a fraud was contemplated or committed. This instruction was too broad. It withdrew from the jury the question whether an actual fraud was committed. All the authorities, require that this question shall be submitted to the jury : Dean v. Connelly, 6 Barr 238 ; McMichael v. McDermott, 5 Harris 353. Even if a fraud were intended, yet if none was committed, neither the defendant nor his creditors have just ground of complaint. Abbey v. Dewey, 1 Casey 413, merely decides that if the purchaser resorts to a trick or any fraudulent device to obtain the property below its value, and thereby purchases it for less than it would have sold for at a fair sale, the sale to him is void. It is true there are cases which hold that such sale would be void even if the property sold for its full value : Staines v. Shore, 4 Harris 203. But they are manifestly instances in which there was proof that some one was prevented from bidding who would have paid more than the full value. The defendant in an execution has the right that his property shall bring all that the fancy or the caprice of bidders will give. If a purchaser will give twice its value, the defendant is entitled to his bid, and, in such case, it is no answer to say the property brought its full value. But such instances are exceptional, and are not to be presumed. As a general rule, where property has brought its full value, there is no room for the presumption of fraud in the sale. And even a combination between creditors does not necessarily indicate fraud. Creditors whose money is in peril have rights as well as debtors. It was said in Smull v. Jones, 1 W. & S. 128 : " Lien creditors, as well as others, may purchase jointly at sheriff's sale, if all be open and fair. A combination of interests for that purpose is not necessarily corrupt. It is the end to be accomplished which makes such a combination lawful or otherwise ; if it be to depress the price of the property

[Oram *v.* Rothermel.]

by artifice, the purchase will be void; if it be to raise the means of payment by contribution, or to divide the property for the accommodation of purchasers, it will be valid." Slingluff *v.* Eckel, 12 Harris 472, merely decided that when one judgment creditor agreed to pay the claim of another judgment creditor, if the latter would not bid, the contract was a fraud against the defendant if he had not acceded to it; and even if he had, the other creditors might be affected by it. The court very properly declined to enforce such a contract, upon grounds of policy. This presents a very different question from the one we are considering. The issue here is whether the defendants had been injured by an actual fraud.

There may be instances which will readily suggest themselves, where by agreement but a single creditor should bid for all. Such an arrangement might even be in the interest of the defendant himself. The crucial test of all such arrangements is whether it is fair and without intent to depress the property and get it at an under value. This question must in all cases be referred to the jury, and it was error in the court below to rule it as a question of law irrespective of the element of fraud in fact.

The answer of the learned judge to the plaintiff's fourth point (sixth assignment) is open to the same criticism. The jury were told that if either of the defendants, at the time of the sale, induced Joseph K. Maurer to believe that they were bidding in the colliery for Richard; or that they promised to pay his claim against the defendants, and that if by either of said means Maurer was induced not to bid, it was a trick and contrivance, and avoided the sale to the defendants as against the plaintiffs. Here the question of fraudulent intent is again omitted. The jury were substantially instructed that the mere fact that either of the defendants stated that they were buying the property for Richard was a fraud, no matter whether the statement were true or false. I am not aware of any authority that will sustain this ruling. Sharp *v.* Long, 4 Casey 433, is authority against it.

The seventh, eighth, ninth and tenth assignments all raise substantially the same question, viz.: that the court erred in leaving to the jury to find that the representations made by the defendants, at the sheriff's sale, in regard to their purchasing the colliery for Richard, were false and fraudulent, without any evidence in the cause of such falsehood or fraud sufficient to justify a verdict to that effect.

The only evidence was that of Richard B. Douty himself. He said: " I went up and saw my brother John B. Douty, and I told him, says I, ' John, I have been sent here by a party who

[Oram *v.* Rothermel.]

is able, to ask if you will take dollar for dollar, with interest to date, for your claims against me, and leave the colliery come back to me.' Says he, ' Who would be fool enough to do that?' Says I, ' Never mind, the man is able to make his word good.' And he talked there about how he had been kept out of his money by this arrangement, that he had calculated to build an opera house and one thing and another like that, now he couldn't get his money. Says I, ' John, you have a chance to get your money.' He said he wouldn't do it. Then I says to him, ' Now,' says I, ' John, I don't know what more any honest man would want than dollar for dollar, with interest to date,' says I, ' strangers, let alone being brothers.' That wouldn't do ; he would not take it. I came down to Weaver's hotel. I met Mr. Baumgardner in the office or just coming in the office of the hotel there. Says I, ' Mr. Baumgardner, will you take dollar for dollar for your claims against me, dollar for dollar, with interest to date?' No, he wouldn't, he wouldn't have anything to do with it." Mr. Fageley was examined and said that he told Richard to make this offer, and promised the necessary funds. Yet it is apparent from the testimony he had no idea of the amount of money that would be required ; he thought some $18,000 to $20,000, whereas the indebtedness for cash advanced and indorsements to Baumgardner, Wm. H. and John B. Douty would seem to be not less than $60,000.

If this offer was regarded by Douty and Baumgardner as a serious one, which is hardly probable, it yet amounts to nothing. It was not an offer the parties were bound to accept, even though they intended to carry out in the strictest good faith their declarations in Richard's favor made at the sheriff's sale. They had a clear right to hold the colliery until repaid from the profits all their cash advances and liabilities for indorsements. The colliery was sold March 4th 1873 ; the conversation Richard speaks of was about the middle of May succeeding. In the meantime it is not alleged that any considerable amount of profits had been realized. But expensive and extended repairs had been made. The offer did not include these repairs, nor the indorsements of Wm. H. Douty. It might well therefore be refused, and yet be no violation of the implied trust in Richard's favor. There was no denial of his right to claim the colliery after the purchasers had fully realized their claim. It is a trust enforcable in equity. But this attempt to wrest the colliery from the defendants eight months after they acquired title, before they had even a chance to reimburse themselves, upon such flimsy testimony as that detailed by Richard B. Douty, is not entitled to succeed. We are of opinion that upon this branch of the case the court should have given the jury a binding instruction. There was not suffi-

cient evidence of the bad faith of the defendants to have submitted to the jury.

The learned judge evidently misunderstood the object of the plaintiffs' first point. The point was : "That the plaintiffs have not shown any title in them to enable them to maintain this action, and the verdict should be for the defendants." Few judges would understand that under this point was concealed the fact that the plaintiffs by an oversight had omitted to offer in evidence their letters of administration. This was purely a technical matter ; the answer of the judge disclosed that he did not understand the point to refer to it. If a specific instruction was desired upon the effect of the omission referred to, the judge should have been asked for it when he answered the point. This would only have been just to the court below. The plaintiffs' title was defective in the absence of the letters of administration. But were this the only error we would not reverse.

> Judgment reversed, and a venire facias de novo awarded.